## No. 15,227.

### Honda *v*. The People.
(141 P. [2d] 178)

Decided July 6, 1943. Rehearing denied September 13, 1943.

Messrs. McDougal & Oakes, for plaintiff in error.

Mr. Gail L. Ireland, Attorney General, Mr. H. Lawrence Hinkley, Deputy, Mr. James S. Henderson, Assistant, for the people.

*En Banc.*

Mr. Chief Justice Young delivered the opinion of the court.

A criminal information was filed in the district court charging George Honda with the murder of his wife, Mary Honda. A jury returned a verdict against him of murder in the first degree and fixed the penalty at death. A motion for a new trial was filed and overruled, and judgment imposing the penalty of death was entered on the verdict. Seeking to reverse this judgment defendant has sued out a writ of error in this court.

Defendant's counsel treats his sixteen assigned errors as raising seven issues and we shall accept these as the issues in the case since they fairly comprehend the points specified as constituting error. Defendant asks

that the judgment of the district court be set aside and that he be granted a new trial because the court erred in entering its judgment in that: 1. The verdict is clearly the result of passion and prejudice, and is not the result of a fair and impartial consideration of the evidence by an unbiased jury; 2. the court should have granted a continuance under the circumstances presented; 3. the defendant was denied the equal protection of the laws guaranteed by the Constitution because people of his own race were excluded from the jury; 4. the alleged confession of defendant was not free and voluntary and was not, in fact, his confession and was erroneously admitted in evidence; 5. the defendant was further prejudiced by remarks of the two prosecuting attorneys, which injected the dangerous Japanese situation into the case; 6. certain instructions tendered by the defendant should have been given, and Instruction No. 22 given by the court did not correctly state the law; 7. a new trial should have been granted for the reasons set forth in the motion for a new trial, and especially on the grounds of newly discovered evidence; the court erred in striking defendant's affidavits in support of the motion for a new trial.

From the record it appears that George Honda, thirty-seven years of age, an American citizen of Japanese extraction, was married to the deceased, Mary Honda, for a period of seven years. He is the father of two children, one aged three years, the other three months. Defendant was born in Honolulu, Hawaii, and when three months old was taken by his mother to Japan where he resided until he reached the age of sixteen. He then came to the United States, going to Washington, D. C., where he resided with an uncle for a period of eight years during which time he attended grammar and high school. Upon his uncle's death he received a small amount of money. He thereafter served as butler for a wealthy man in Plainfield, New Jersey, and after so serving for a time, went to Japan in search of relatives, later returning to

his old position in New Jersey as butler. He then went to California, bought a twenty-acre strawberry farm and engaged in business with an uncle. This place was destroyed by flood and he then entered the restaurant business in California. He came to Denver about eight years before the homicide, worked as a cook three or four years, and again engaged in the restaurant business, purchasing and operating the United States Cafe on Seventeenth street, Denver, which he was conducting May 3, 1942. On this date, which was Sunday, he arose at his usual time, very early in the morning, left the hotel apartment, and went to the restaurant. Shortly thereafter he returned, as was his custom, with milk for the baby. Later in the day one of his employees being absent, he returned to the hotel to ask his wife Mary to look after the restaurant while he went in search of another employee. Upon his return Mary went to their apartment to write the menus for the day. During the forenoon Honda was drinking various kinds of liquors, principally whiskey, some wine, and some beer. At about 10:45 a.m. he again returned to the hotel where he found his wife attempting to call her parents who resided near Brighton. Apparently angered by her action, he attempted to prevent her exchanging a dime for two nickels so that she could make the telephone call, and pulled her out of the telephone booth. He tried to induce her to go upstairs with him and she refused. She then requested the clerk of the hotel, a Mr. Thompson, to call her parents. Thompson complied with her request but ascertained that they were absent, and other members of the family suggested that he call Harry Osumi, a fellow countryman of defendant who appears to have acted as mediator on occasions in difficulties and quarrels between defendant and his wife. Defendant continued to be quarrelsome and the clerk told him that if he did not quiet down he would put him out. Honda then went upstairs. The clerk continued his call for Harry Osumi and Mary Honda sat down in the lobby

284

of the hotel in a chair that stood next to the end of a settee on which the witness Patterson was sitting. Honda returned to the lobby. He walked to the place where his wife was sitting and cut and stabbed her at least four times, inflicting horrible wounds on her head, back, neck and abdomen. She rose from the chair, slumped to the floor, and apparently died almost instantly. The clerk Thompson, witness Patterson, and a third person, McCurry by name, disarmed Honda, threw him to the floor and restrained him until the police arrived. During this struggle, McCurry struck Honda a hard blow with his fist. After routine examination, police officers conveyed Honda to the police station. He was apparently highly excited and they were unable to talk with him or get any coherent replies to questions at that time, but about three hours later, after he had calmed down, he signed a statement, referred to in the record as his confession, in which he recited the salient facts as hereinbefore related. At this conference Harry Osumi was present and carried on conversation in the Japanese language with defendant, the purport of which, together with defendant's replies, was unknown to the officers. Honda says Osumi told him to sign the confession for he had killed his wife and did not have long to live in any event.

We find no merit in defendant's first· contention that the verdict is clearly the result of passion and prejudice, and not the result of a fair and impartial consideration of the evidence by an unbiased jury. Considering the particularly brutal character of the killing, as disclosed by the testimony above outlined, the lack of any immediate adequate provocation even to serious anger, to say nothing of a murderous assault, and the entire absence of any controversy or dispute in the evidence of the fact or manner of the killing, it is not at all out of the ordinary course of events that the jury returned a verdict of first degree murder with the penalty fixed at death.

Counsel stresses the fact that defendant was of Japanese extraction, that this country is at war with Japan, that there is throughout the country a conscious, and if not a conscious, at least a subconscious hatred of members of the Japanese race, so intense that it was impossible for Honda, because he is a member of such race, to receive a fair trial while the state of war continues, and that he did not receive a fair trial. It would be futile to deny that such conditions have tended to inspire in a large part of our citizenship a dislike of the Japanese as a race because of their supposed or assumed racial characteristics. That it had become so general as to constitute a mob psychology at the time of the trial we think does not appear from the record. In this connection it may be noted that the victim, his wife, also was a member of the Japanese race. Defendant, at the time of the crime and for six months prior thereto and after the beginning of the war, had operated a restaurant on one of the main streets of Denver, and, as is disclosed by the record, was not without customers other than those of his own race. He and his family continued to occupy a hotel apartment on the same street, operated and patronized by members of the white race. At the very time of the killing, the clerk of the hotel, as a favor to defendant's Japanese wife, was engaged in calling Harry Osumi, a Japanese friend, also shown by the record to be operating a business in the city of Denver. This call was being made upon the suggestion of some member of Mary Honda's family at Brighton, also of the Japanese race, to whom the clerk had already talked at Mary's request. These facts, gleaned from the record, bear mute testimony that there was in the vicinity no general subconscious hatred or undercurrent of prejudice of such intensity that we may assume or conclude it had the effect of causing the jury to render a verdict based on passion or prejudice.

██ Furthermore, the defendant, as does any person who commits the crime of murder, in choosing the

place of his crime selected the forum of his trial. He, like any other defendant who chooses to commit a murder in such ruthless and cruel manner and by such brutal means as to shock the sensibilities of all normal-minded persons, even beyond the point necessarily incident to any killing, must abide the consequences of his acts and their resultant effect upon persons of normal and ordinarily humane instincts. Our jury system is not a perfect one, though doubtless the most satisfactory and humane, under all conditions, for the performance of the functions for which it was devised. Our law providing different degrees of culpability on the part of one guilty of homicide and for two grades of punishment, life imprisonment and death for first degree murder, is a recognition of the reactions of mankind to the taking of life under various conditions and by various means. All our fundamental laws are but a recognition of the composite reactions of mankind to recurring situations. We do not believe that the jury in this case reacted to the situation disclosed by the evidence in any other or different manner than would juries confronted with evidence of homicides attended by similar circumstances of wantonness and brutality perpetrated by defendants of Anglo-Saxon lineage. Whether jurors in rendering a verdict, depart so far from the manner in which jurors customarily act when confronted with similar situations and circumstances as to justify the conclusion that they were motivated, not by regard for their oaths and duties under the law, but by passion and prejudice, is a question of fact to be determined from the character of their act as related to all the circumstances of the particular case. We find nothing in this record that establishes, as a fact, that the verdict of the jury resulted from passion and prejudice, rather than from a fair and candid consideration of the evidence.

Defendant contends that it was error for the trial court to deny his two motions for a continuance and require him to go to trial June sixteenth.

It appears that defendant obtained counsel May ninth, six days after the homicide. He was arraigned May eleventh and committed to the Colorado Psychopathic Hospital for an examination as to his sanity, where he was confined from May twelfth to June first. On the fourth of June a motion for continuance until the September term of court was filed based upon the ground that the psychiatrist employed by defendant would not have sufficient time to fully examine him and arrive at a conclusion as to his mental condition. On June ninth a second motion for a continuance of the cause was filed in which it was alleged that the feeling engendered by the fact that the United States and Japan were at war was such as to prevent defendant from obtaining a fair trial and praying that he remain incarcerated without being tried during the war, when presumably the feelings of racial antipathy would subside so that he could be accorded a fair trial. This motion was supported by the affidavit of defendant's counsel to which was attached a large number of newspaper clippings. Both motions were denied and the cause proceeded to trial on June sixteenth. The motion for continuance for the term was supported by the affidavit of Dr. Tepley, the psychiatrist employed by defendant, in which he stated that he would not have sufficient time for a full and complete examination; but when, at the opening of the trial, the court inquired if the parties were ready, defendant's counsel answered that defendant, without waiver of the motions filed, was ready for trial. The court then inquired if Dr. Tepley had not stated that he had had sufficient time to form his opinion, to which inquiry counsel for defendant replied: "He [Dr. Tepley] has stated, .yes, that he does not feel that we would gain anything by any more time." The granting or denying of the motions for a continuance was a matter within the discretion of the trial court, and its rulings should not be disturbed in the absence of a showing of abuse thereof. *Sharp v. People,* 90 Colo. 356, 9 P.

(2d) 483; *Epley v. People,* 51 Colo. 501, 119 Pac. 153. We find here no abuse of the trial court's discretion.

■ To support the second motion, for continuance for the duration of the war, defendant's counsel furnishes us no authorities directly in point. The one most nearly applicable to such a situation is from 3 Wharton on Criminal Law (7th ed.), page 86, section 3033, where the author states: "Thus it has been held that where the public excitement was such as to intimidate and swerve the jury, the motion should be granted." Citing, *Commonwealth v. Dunham,* Thac. C. C. 516. This unquestionably is true as a general proposition of law. An examination of the case on which this statement is based discloses that the offence charged was a violation of the banking laws; that the banks had recently suspended specie payments with consequent great public excitement. The offence charged had no connection with the suspension of such payments. The supporting affidavit alleged that it was the belief of defendants that by the next term of court the excitement would have subsided and a fair and impartial trial would be possible. It was held a continuance should have been granted. This is a far different situation from that presented by an application for a continuance until the end of a war of indefinite duration, during which time it might well be that racial hatred, even if then nonexistent, would be lighted up and fanned into flame. We think there was no sufficient showing of a racial antipathy so general in extent as to preclude defendant's obtaining a fair trial. The trial court so found, and under the rule above noted and the authorities in support thereof, we are not authorized to disturb the exercise of an unabused discretion.

It is worthy of note that at the very inception of the trial the court advised the prospective jurors of their duty and admonished them to avoid any preconceived prejudices, calling their attention to the fact that the

very objective of the war was to preserve individual human rights. He said:

"I would like to say a few words before this trial begins to the gentlemen who have been called to serve on this panel as jurors. This case on trial today is that of the People against George Honda, and is a trial for murder. The defendant, though I am informed he is an American citizen, is of Japanese extraction. Of course, we are at war with Japan at this time, and all of us well understand that it is possible for some individuals to have a prejudice against anyone of Japanese extraction. You gentlemen should know, of course, that the trial of a party for crime in a criminal court of this country is governed by our Constitution and our laws for the protection of the individual tried to make certain that no innocent man so far as that can be avoided will be convicted of a crime of which he is not guilty.

\* \* \*

"I think I do not need to say to you gentlemen that that is one of the things that we are in this war for, to protect, and if any individual is drawn into the error of allowing racial prejudice to enter into his service as a juror, he is simply doing that much to destroy the institutions that protect our own liberty as well as that of any person who comes to this country and happens to be charged with crime."

██ The defendant predicates error on the fact, as he alleges, that: "The defendant was denied the equal protection of the laws guaranteed by the Constitution because people of his own race were excluded from the jury."

We find no merit in this contention. There is no showing that any of the members of the jury panel, or of the jury, were not qualified to sit as jurors in the trial of the cause. Defendant did not challenge the array and ask to have the panel from which the jury was selected quashed because of unlawful discrimination in their selection, in that eligible citizens of Japanese extraction

were excluded because of their race. This issue he raised, not before the trial, but in his motion for a new trial, after the jury had been examined, selected and sworn and had tried the cause. This question was injected into the case too late to avail defendant anything. By failing to make timely objection, he waived the point. The trial court never ruled, nor had an opportunity to rule, on this point until the cause had been tried by jurors eligible to serve as such and who, so far as anything in the record shows, were accepted by defendant.

Counsel relies on six cases as authority supporting his contention that defendant was denied the equal protection of the laws because members of his race had been excluded from the jury. We have carefully examined all these cases. Each involves the exclusion of negroes from the grand or petit jury where a negro defendant was charged with the commission of a crime or was on trial. They are not applicable to the situation presented by the record in this case. In *Bone v. State,* 198 Ark. 519, 129 S.W. 240, the matter arose on a motion, before trial, to quash the venire from which the petit jury was to be drawn. In the instant case it was not attempted to be raised except as a ground for a new trial and the district court ruled, and we hold, that the application was too late.

In *Haraway v. State,* 202 Ark. 845, 153 S.W. (2d) 161, the indictment, attacked before the trial, not after as in this case, was quashed because the court refused to hear evidence on the allegation in the motion that it was, and for a long time in that county had been, the settled practice to exclude negroes solely on account of race when summoning a grand jury. In the second trial of the same case, reported under the caption of *Haraway v. State,* 203 Ark. 912, 159 S.W. (2d) 733, a special grand jury was called for the specific purpose of investigating defendant's case. All of the members of this grand jury, as summoned, were negroes. The defendant assigned as error that this was as much a discrimination as though

all called had been white men. On this point the court said:

"The order of the court did not require or direct the sheriff to summon an all negro grand jury, and appellant made no objection on this account before or at the time of impaneling the jury, but took a chance on its action by waiting until after the return of the indictment to question the procedure, and we think he has waived it.

\* \* \*

"But if complaint is made we think no error was committed, as appellant was not entitled to any particular juror, but was entitled to trial by a fair and impartial jury. *The discrimination against which the law protects is in the impaneling of the jury. It is not contended that the trial jurors were not qualified."* (Italics ours)

In *Neal v. Delaware,* 103 U. S. 370, *Carter v. Texas,* 177 U. S. 442, and *Norris v. Alabama,* 294 U. S. 587, the discrimination on account of race in the selection of the jury, alleged as denying to the defendants under the Constitution the equal protection of the laws, was asserted before trial. We do not question the law as laid down in those cases. Defendant's counsel, as we read the motion for new trial and his brief, conceives the vice at which these cases are directed to be that a fair and impartial trial is not accorded a defendant of a given race unless his cause is heard by a jury composed of members of his own race or by one made up of members of different races, including his own. The cases do not so hold. They go no further than to say that when timely objection is raised a defendant shall not be required to submit to a trial by a jury even of individually eligible and qualified members if he is denied the possibility or probability of having a member of his own race called upon the jury selected to hear his case because members of his race were excluded from the jury panel from which the jury was obtained on account of their race or color. On a proper and timely assertion of the defendant's right as declared in those cases and

upon a proper showing, it would be error for a court to refuse him relief. Here the record does not show, nor is the objection made, that the jurors on the panel were not qualified to serve as such; neither are any facts alleged showing that they did not honestly and fairly and to the best of their respective abilities determine the issues upon the evidence and the law as their oaths required.

In his affidavit in support of the motion for continuance of the cause for the duration of the war, counsel for defendant said: "Affiant verily believes that this defendant. cannot obtain and secure before the present jury panel a fair and impartial trial, not because of any particular prejudice in the. mind of any particular juror in said panel, but on account of general prejudice in the minds .of the public in general, including these prospective jurors against any person, or anything, Japanese." True, in his motion for a new trial defendant asserted: "The jury, and the entire jury panel, were prejudiced against this defendant and such prejudice existed prior to the time of the trial and continued throughout the trial, and as a result of said prejudice the defendant did not receive a fair and impartial trial, and the verdict of the jury was the result of passion and prejudice against this defendant, and said verdict was erroneous and is null and void." Unless we assume that after the verdict defendant's counsel changed his mind with respect to the individual jurors, which we do not assume, the ground .of the motion last quoted must be deemed to be directed to that state of mind of the general public to which defendant's counsel referred in his affidavit for a continuance for the duration of the war as being such that any juror, whether from Denver or any other county of the state would be subconsciously prejudiced in the trial of a member of the Japanese race. As we have already pointed out, we do not consider this, under our system of jurisprudence, a sufficient ground for indefinitely

postponing the trial of a criminal case. We hold that a defendant may not stand by, participate in, and acquiesce in the selection of a jury composed of men individually eligible for jury service and then, if dissatisfied with their verdict, for the first time attack the manner in which the panel was selected from which the jury was obtained. Such was our ruling in *Daugherty v. People,* 78 Colo. 43, 239 Pac. 14, and *Hoffman v. People,* 72 Colo. 552, 212 Pac. 848. In the latter case, we said: "Even though we are wrong as to this conclusion, the proper practice to raise the question in such cases was not observed. The defendants say that a challenge to the array, or a motion to quash the panel of jurors composed, in part of men who were in the original panel, and in part of those brought in by special venire, was inappropriate because the objection went only to the open venire jurors. Certainly a motion to quash the open venire, and to dismiss the jurors summoned, would be good practice and was appropriate in this case, and should have been resorted to. No such motion was filed. It was necessary in this way to preserve for review the question of the alleged irregularity of summoning a jury. *People v. Connors,* 246 Ill. 9, 15, 92 N.E. 567; *Saunders v. State,* 4 Okl. Cr. 264, 111 Pac. 965, Ann. Cas. 1912B, 766." This, we think, is in accord too with the general law as announced in 31 American Jurisprudence, page 621, where the writer states: "Generally, it may be said that timely and appropriate procedure must be invoked in asserting class or race discrimination in the selection of persons for jury service, and it has been ruled that the challenge to the panel or array must be made before accepting the jury drawn therefrom and entering upon trial."

 We have often held that confessions, to be admissible as evidence in a criminal case, must be free and voluntary. *Reagan v. People,* 49 Colo. 316, 112 Pac. 785; *Tuttle v. People,* 33 Colo. 243, 79 Pac. 1035; *O'Loughlin v. People,* 90 Colo. 368, 10 P. (2d) 543; *Ingles*

*v. People,* 92 Colo. 518, 22 P. (2d) 1109. We do not find merit in defendant's contention that his confession was not free and voluntary. The district court held a thorough hearing on this matter out of the presence of the jury and on conflicting evidence determined that it was voluntary. We find no reason in the record for disturbing the court's holding. *Fincher v. People,* 26 Colo. 169, 56 Pac. 902; *Pearson v. People,* 69 Colo. 76, 168 Pac. 655; *Osborn v. People,* 83 Colo. 4, 262 Pac. 892. Furthermore, defendant himself, either on direct or proper cross-examination, when he took the stand in his own defense, testified in substantial effect to the matters contained in the confession. Under such circumstances, even if otherwise erroneous, though we think in fact it was not, its admission in evidence does not constitute prejudicial error. *Moya v. People,* 88 Colo. 139, 293 Pac. 335; *Reppin v. People,* 95 Colo. 192, 34 P. (2d) 71.

It is contended that prejudicial error resulted, because the district attorney in his argument appealed to race prejudice. We are of the opinion that the record does not sustain this contention. As previously noted, the court at the very beginning of the trial, cautioned the jury against letting the matter of race, influence their deliberations and verdict. It was an expert witness called by defendant who first mentioned anything about oriental characteristics. He said: "Then, in this particular case, there is another thing, the mind is Oriental, he thinks and feels and acts very much like an Oriental; he was very little affected by his twenty years of American life. I never have examined an Oriental before, and it is hard for me to try to understand him as fully as I would an American or, to use the loose term, we will say, an Aryan, because all those people haven't the same idea, how their emotions run." This same witness, on direct examination, also said defendant was "ornery." He was asked on cross-examination if that was characteristic of orientals, and he answered that it was, and he later stated that it was a national

characteristic, but that he was dealing with Honda as an individual and not as a member of a particular race. He was stopped from making further observations, not by objection of defendant's counsel, but by an objection by the district attorney. Upon this record, and without any full report of the argument to show to what, if anything, the challenged portion was responsive, defendant now says that certain portions of the district attorney's argument injected the race question into the trial and was prejudicial to defendant's rights. We have examined the transcript of the argument to which objection is made, and, considered in the light of the whole evidence, we think it does not go beyond the bounds of legitimate comment on the evidence. The portion of the argument on which defendant most strongly relies as being prejudicial is that wherein the district attorney was addressing himself to Honda's professions of affection for his wife when he was endeavoring to induce her to leave the lobby of the hotel and go to their apartment just before the killing. The gist of his argument is that this was with the intent in view to kill her in their apartment and this, the professions of affection for her, he said, were a typical example of oriental treachery. As we have stated, the record does not disclose to what, if anything, this argument was responsive; neither does it disclose that defendant's counsel objected to it when made. Had he done so, the court doubtless again would have advised the jury that it was Honda's conduct they were to judge in the light of the evidence rather than in the light of any supposed racial characteristics. In the formal instructions of the court, the jury was told that the arguments of counsel were not evidence. The court, in strong terms, had advised the jurors at the beginning of the trial that they should not permit racial prejudice to influence their deliberations or verdict. Just prior to the statement complained of, the district attorney had in effect stated that he asked no other or greater penalty than should be meted out to a white

man under the same circumstances, but that he felt they should not, because actuated by a desire to be fair and impartial, assess a lesser penalty than they would assess against a white man under the same circumstances. This was a fair, even a judicial statement of the jury's duty under the theory of the prosecution, and was not inflammatory in character. Each question relating to alleged prejudicial argument must be judged in the light of the facts of the particular case in which made. We think the statement to which defendant now objects, and to which no objection was raised when it was made and when the trial court could have given such caution concerning it as he deemed necessary, was not of such character that it did or could have prejudiced the defendant by affecting the jury's verdict in any manner. The assignment of error based thereon is not well taken.

Instruction No. 22 defines the law for the guidance of the jury in substantial effect as this court held was proper in *Brennan v. People,* 37 Colo. 256, 86 Pac. 79. The jury having been fully instructed as to the manner in which defendant's intoxication might be considered in returning their verdict, it was not error to refuse defendant's tendered instructions on the subject. *Feste v. People,* 93 Colo. 206, 25 P. (2d) 177; *Todd v. People,* 82 Colo. 541, 261 Pac. 661.

We find no error in the court's refusal to grant a new trial on the ground of newly-discovered evidence. The evidence alleged to have been newly discovered, was set out in certain affidavits, one to the effect that sometime before the killing the deceased had gone to Richard F. Ryan, a member of the City Attorney's office, and had made complaint that defendant was not of sound mind. Another was made by a former employee of Honda to the effect that on various occasions he had had illicit relations with deceased. The third was by counsel for defendant and was largely an expression of opinion as to the effect that the alleged newly-discovered evidence of the complaint of Mary

Honda that Honda was insane and of her alleged infidelity, would have had on the jury's verdict. The district attorney filed counter affidavits and a motion to strike the defendant's affidavits on the ground that the alleged evidence was immaterial and irrelevant. Defendant then moved and supported his motion by affidavits, to strike the district attorney's motion to strike. The district attorney's motion to strike was granted and defendant's motion to strike was denied. The court then held a full hearing in which the former employee, Cameron, testified as to his illicit relations with deceased, the last act he alleged, being on May first preceding her death on May third. Nowhere did it appear that Honda ever knew or gave evidence of having suspected his wife and Cameron. From May 1 to June 27, Cameron was in Fitzsimons Hospital, so there was no possibility of his testimony corroborating that of Honda that he found a man in his apartment with his wife on May third several hours before the killing. The trial court in ruling, stated that such evidence could be admissible only to show defendant's possible state of mind at the time he committed the homicide and it not appearing that he had any knowledge of the alleged conduct of his wife that it could not have influenced him in any way. The court further observed that the wife's character is not in issue. The ruling of the court that the evidence was irrelevant was correct for even if the wife had been guilty of adultery this in itself is not a fact that either excuses the husband's act of killing her or that should be considered by the jury in mitigation of his punishment.

The judgment is affirmed, and it is ordered that the sentence thereby imposed be executed during the week beginning October 3, 1943.