No. 21117.

NATHANIEL RAULLERSON *v.*
PEOPLE OF THE STATE OF COLORADO.
(404 P.2d 149)

Decided July 6, 1965. Rehearing denied July 26, 1965.

AKOLT, SHEPHERD and DICK, WILLIAM G. KEMP, for plaintiff in error.

DUKE W. DUNBAR, Attorney General, FRANK E. HICKEY, Deputy, JOHN P. MOORE, Assistant, for defendant in error.

*En Banc.*

MR. JUSTICE SCHAUER delivered the opinion of the Court.

BY information filed June 1, 1962, Nathaniel Raullerson, hereinafter referred to as the defendant, was charged in separate counts with: (1) Assault with a deadly weapon; (2) kidnapping; (3) rape, and (4) assault to rape, all allegedly committed upon the person of the complaining witness. Through court-appointed counsel he entered pleas of not guilty, and not guilty by reason of insanity, to each charge, the latter pleas being subsequently withdrawn. Trial was had to a jury, commencing December 18, 1962, and continuing over a period of several days. The jury found defendant guilty

of the first three counts and he was sentenced to the State Penitentiary for a term of not less than four years nor more than five years on the charge of assault with a deadly weapon; a term of not less than twenty-five years nor more than thirty years on the charge of kidnapping, and a term of not less than fifty years nor more than life on the charge of rape, the sentences to be served concurrently.

Defendant prosecutes this writ of error, setting out twenty-four arguments upon which his assignments of error are based. These arguments will be consolidated so far as possible for convenient consideration.

The facts, briefly stated, are that at approximately 1:30 A.M., on May 19, 1962, the complaining witness, a girl eleven years of age, hereinafter referred to as the victim, complaining witness, or the girl, together with several of her friends of about the same age, pursuant to a prearranged plan, left their homes and met on the grounds of a school in East Denver. They had plans to soap the windows and decorate with toilet paper the homes of acquaintances not in the group. They started through a residential area nearby, when a man driving a car stopped and asked them if they wanted a ride. The offer was refused and the man drove around the block, whereupon the group scattered. The man then left his car and caught the girl, telling her that he was a policeman. He had a gun in his hand, pushed her to the car and forced her into the back seat. He drove to a point in East Denver where he parked the car, climbed into the back seat, removed his own clothing, pulled off the victim's clothes, and allegedly raped her. She testified as to the details of the incident. He then drove to a spot near the girl's home and left her. The car was found the next day, parked in front of a house on York Street in Denver which was occupied by defendant and his mother.

The identity of the car driven by the man who had picked up the victim as the car owned by defendant was established by competent evidence. One of the boys in

the group referred to testified that he was well acquainted with General Motors products, particularly with Chevrolets. He identified the car that had stopped, at the time the little girls were asked if they wanted a ride, as a white 1958 Impala Chevrolet, by the number and location of its headlights and tail lights and his experience in identifying the year of particular cars. One of the girls identified the car in the same way, also mentioning certain chrome characteristics of this particular model. She and two others further identified it as being the same model of Chevrolet owned by the father of one of the girls. The complaining witness testified that it was a "'58 or '59 Chevy."

There is in evidence a portion of the permanent records of the Denver Motor Vehicle Department, showing that license number AT 7239, issued February 28, 1962, on a 1958 Chevrolet 4-door sports car to Nathaniel Raullerson of 2225 York Street, Denver. Defendant's car was so licensed, and on the morning following the attack, this car was found parked in front of the York Street address. The record shows that the car was repossessed from defendant under a chattel mortgage and was impounded in a police pound where it was later identified by the victim as the car in which she had been attacked.

Defendant asserts that he was not sufficiently identified as being the man who had picked up the complaining witness. At the trial she pointed out to the jury the defendant sitting in the court room as the man responsible for the attack. At a police "line-up," she and another girl of her group identified the defendant by his voice as the man who had stopped on the street on the night in question and asked the girls if they wanted a ride. The girls, but eleven years of age, were extensively cross-examined, and their testimony was shaken very little. For example, one girl testified:

"Q. You haven't seen him [the defendant] at all up until the time you took the stand, is that right?

"A. I saw him at the lineup."

The witness and the complaining witness had been sitting together at the time of the line-up. Five or six men, the majority of them colored, had been paraded before the girls, but five or six feet distant; had been numbered and required to speak distinctly and, among other things, to repeat the words, "Do you girls want a ride?" At the same instant, the two girls identified the defendant and called out his number. After many questions, framed in various ways, in an attempt to discredit the testimony of the witness, she was asked if it were possible that she could be mistaken about the identification of the man who "shouted" that night. She replied in the affirmative. The witness had repeatedly stated that the man who had accosted the group had spoken in an ordinary tone of voice, and had not "shouted." After being grilled for hours by aggressive counsel, this little girl made the above admission, and defendant now claims that she was discredited as a witness.

The question of the credibility of a witness was a matter for jury determination. Pertinent language and citations are found in the case of *People v. Spinuzzi*, 149 Colo. 391, 369 P.2d 427:

"* * * It is not essential that a witness be free from doubt as to the correctness of his opinion nor that he be able to identify the accused positively, 2 Wharton's, *Criminal Evidence*, (12th ed.) 380 § 533. The uncertainty of identification goes to its weight rather than to its admissibility. *State of California v. Charles Cahan*, 297 P.2d 715, c.d 352 U. S. 918."

Also in the case of *McClenny v. People*, 155 Colo. 202, 393 P.2d 736, it is stated:

"* * * This Court is not charged with the duty of weighing the evidence and determining the degree of credibility which should attach to persons testifying in a trial court. * * *."

Moreover, the victim's testimony stands uncontradicted.

Within a day or two after the alleged offense,

these witnesses were interviewed by detectives or police officers, who made notes as the interviews progressed. Throughout the trial counsel for defendant invoked Rule 16 (b), Colo. R. Crim P., which reads as follows:

"After a witness called by the State has testified on direct examination, the court shall on motion of the defendant order the prosecuting attorney to produce any statement of the witness in the possession of the prosecuting attorney or under his control which relates to the subject matter to which the witness has testified. * * *."

In each instance the prosecuting attorney produced and handed to defendant's counsel the notes taken by the interviewing officers who had interviewed the various witnesses. These notes are in evidence. We have reviewed them and find no material variations between the notes taken by the officers and the testimony of these officers and the witnesses so interviewed, as given at the trial.

Because of the serious nature of this case, consideration in some detail is given the arguments upon which defendant relies for a reversal of the judgment. He first argues:

"The trial court erred in denying the court-appointed attorneys' Motion to Withdraw and in denying the Defendant's Motion for a continuance to a time when counsel of his own choosing could represent him."

On November 13, 1962, defendant advised the court that he was dissatisfied with his court-appointed attorneys and that at his request his mother had employed one Irving Andrews (who was then present in Court) to represent him. His court-appointed attorneys then requested leave to withdraw from the case. The following colloquy is of record:

"THE COURT: Well, Mr. Andrews, if Mrs. Raullerson wants you in this case, you will have to take it subject to this Court's docket.

"MR. ANDREWS: I know. I said to you and I advised Mr. Raullerson and Mrs. Raullerson at the time she con-

tacted me that it depended upon whether the case was set — whether it was set when I can do it."

\* \* \*

"THE COURT: All right, we'll try it if we have to bring in two judges, on Monday, December 17th. If you can be ready for trial on that date, Mr. Andrews, fine; if you can't be ready for trial on that date the court-appointed counsel will remain in this case.

"MR. ANDREWS: I think that is the only thing to do, your Honor, and I concur.

"THE COURT: As far as I am concerned, I want the record to reflect that Mr. Fugate and Mr. Herrmann are both competent counsel, I don't think there is any question about that.

"MR. ANDREWS: I don't think there is any question about that either, your Honor."

Mr. Andrews did not enter his appearance as counsel for defendant at that time, nor within the period of one month and five days thereafter prior to the day set for trial. The court had appointed counsel to represent the defendant upon his application as an indigent person. The defendant was granted ample time in which to employ counsel of his own choosing. The failure of employed counsel, if one was employed, to enter his appearance is not explained. No doubt the court-appointed attorneys would have welcomed Mr. Andrews' appearance as co-counsel, but we may say in passing that they overlooked nothing in the way of a possible defense, and tried the case in a careful and conscientious manner. The defendant received a fair and impartial trial. The granting or denial of a continuance is within the sound discretion of the trial court and we find no abuse of discretion in this case. *Epley v. People,* 51 Colo. 501, 119 Pac. 153; *Randal v. People,* 113 Colo. 235, 156 P.2d 125; *Honda v. People,* 111 Colo. 279, 141 P.2d 178; *Baca v. People,* 139 Colo. 111, 336 P.2d 712. The record does not show that defendant was prejudiced in any way by the ruling of the trial court in this regard. Defendant argues that the ac-

tion of the court constituted a denial of the constitutional rights of defendant granted under the United States and the Colorado Constitutions. We do not agree because the record clearly reveals that defendant was represented by competent and vigorous counsel.

Defendant further argues:

"The Defendant was denied trial by a fair and impartial jury by the court's refusal to permit counsel for the Defendant to question prospective jurors on voir dire as to their attitudes regarding organizations which exclude persons from membership because of race." (The defendant being a Negro.)

■■ A supplemental transcript of a portion of the *voir dire* examination, including the questions asked and answers given by the prospective jurors to which the issue applies, appears of record. No prospective jurors whom defendant sought to interrogate regarding these matters were accepted on the jury. Only those who expressed sympathy with the problems of the Negro, or had no opinion as to these matters, were seated on the jury. And here, again, the extent of *voir dire* examination is addressed to the sound discretion of the trial court; in none of its rulings on the *voir dire* examinations do we find any error which resulted in the seating of a jury which was not fair and impartial. Under these circumstances the defendant was not subjected to prejudicial error. Rule 24(a)(1), Colo. R. Crim. P., is applicable in this situation, as is the language in *Routa v. People*, 117 Colo. 564, 192 P.2d 436, wherein the court stated:

"We have many times held that matters, such as the above, are clearly within the sound discretion of the trial court, and that in the absence of abuse of discretion its ruling thereon will not be disturbed on review. *Van Houton v. People*, 22 Colo. 53, 43 Pac. 137; *Wheeler v. People*, 63 Colo. 209, 165 Pac. 257; *Flor v. People*, 73 Colo. 403, 215 Pac. 875. We conclude that the trial court

did not abuse its discretion, and that the rights of the defendant were not prejudiced."

Defendant further argues:

"The trial court erred in receiving incompetent evidence offered by the People and in refusing competent evidence offered by the Defendant."

■ This argument is based upon alleged failure to fully identify certain exhibits, the objections to which were technical and largely argumentative. The evidence was given to corroborate the testimony of the victim. Officer Dressel had taken a photograph of a latent fingerprint from the chrome on the back of the front seat of the car in which the girl had been kidnapped and raped. Officer Jensen had taken a fingerprint of the girl and testified that an enlargement of the photograph taken by Officer Dressel matched the fingerprint he had taken from her. This issue is not before this court as the defendant failed to preserve it in the trial court, but receives a brief discussion herein in order that the sufficiency of the proof is fully presented.

■ The argument is also made that the court admitted in evidence a leather case containing several keys which were taken from the defendant at the time of his arrest, one of which fitted the car identified as the car in which the alleged attack was made. Defendant argues that the People failed to prove the chain of possession of the keys from the time they were taken from the defendant to the time of the introduction of the keys in evidence. However, the exhibit was definitely identified by Officer Metros as being the keys he himself took from the person of the defendant at the time of the arrest. The record fails to disclose the offer of any evidence by the defendant which was improperly denied by the trial court.

Defendant further argues:

"It was error to permit redirect examination of Officer Shiveley which was not within the scope of cross-

examination and in which entirely new evidence was offered."

Admittedly, the witness was asked questions after his cross-examination had been completed which were not within the scope of the cross-examination. The record shows that at the conclusion of the cross-examination the prosecuting attorney asked permission to *reopen the direct examination.* This he was permitted to do over defendant's objection, the court stating: "It is a discretionary matter. The same consideration would be given to you." The procedure used was analagous to the reopening of the case in chief after the conclusion of testimony; the order of proof is discretionary with the trial court. *Brooke v. People,* 23 Colo. 375, 48 Pac. 502.

Defendant further argues:

"It was error to refuse cross-examination of * * * [the complaining witness] regarding her familiarity with identifying characteristics of Negroes."

Soon after the alleged attack, which must have occurred about 3:00 A.M., the victim had described her assailant as "a very dark Negro." The defendant, however, is light in complexion. Defendant sought to cross-examine her concerning her knowledge or familiarity with members of the Negro race with respect to special or peculiar characteristics of that race regarding complexion, voice, manner of speech or other identifying characteristics; but the district attorney's objections to such cross-examination were sustained by the court. At that time, the girl on three separate occasions had already made positive statements concerning the identity of her attacker, while admitting that she had stated to a detective that he was not dark-complexioned. She identified defendant as an individual, not as a member of a race. Any conflicting statements could affect only her credibility as a witness, a question for the jury to resolve.

Defendant further argues:

"It was error to receive People's Exhibit C into evidence because it was hearsay."

 The exhibit referred to was a part of the permanent record of the Denver Motor Vehicle Department, showing the issuance on February 28, 1962, of License No. AT 7239 to Nathaniel Raullerson of 2225 York Street, Denver, on a 1958 Chevrolet four-door sports car. The address was shown by the evidence to be that of premises occupied by defendant and his mother, and a car of that description, licensed as indicated, was the car in the possession of the defendant on the night of the alleged attack. Defendant questions the exhibit as a violation of the hearsay rule. The exhibit was a public record, kept in accordance with C.R.S. '53, 13-5-11, and identified by the supervisor of the department having complete control over all motor vehicle records and registrations. As a general rule such a document is admissible as an exception to the hearsay rule. 2 Wharton's Criminal Evidence, Section 272; *State v. Vinn,* 50 Mont. 27, 144 Pac. 773.

Defendant further argues:

"It was error to allow Dr. Rice to testify as an expert as to matters outside his field."

 Dr. Paul M. Rice was permitted to testify as to a microscopic examination of a vaginal specimen taken from the victim early in the morning following the alleged attack. Admittedly, he was qualified by the court as an expert in the field of obstetrics and gynecology. But defendant urged that he was not so qualified in the field of pathology claimed to be necessary in order to qualify him to testify as to the presence or absence of spermatozoa in this specimen. However, it appeared that the main purpose of his testimony was to give the result of a physical examination of the girl at about 9:30 A.M. on that morning, concerning which he testified as follows:

"A. She was weeping, looking haggard and tired. The local examination revealed injury, trauma, as evidenced by breaks in the skin and bleeding to the hymeneal ring,

which is the virginal opening to the vagina. There was blood in the vagina. * * *."

He testified that it required the introduction of some object into the vaginal tract to accomplish this result. The girl had testified to such a penetration when raped by the defendant. Dr. Rice was a physician with many years of practice, and qualified to make this physical examination and testify as to the results thereof.

Defendant further argues:

"It was error to receive People's Exhibits M and N into evidence because they were hearsay and not the best evidence."

People's Exhibit M is a certified copy of an application for a marriage license purportedly made by the defendant, and People's Exhibit N, a certified copy of the marriage certificate and marriage license purportedly issued to defendant on February 19, 1960. Their purpose was to show the age of defendant to be over eighteen years. These exhibits were admissible in evidence for the same reason as was Exhibit C, above referred to.

It becomes necessary to discuss the question as to the age of the defendant at the time of the alleged offenses. In a charge of a statutory rape, count Three of the information, it was incumbent upon the People to establish the fact that defendant was over the age of eighteen years on May 19, 1962. He had stated to an officer at the time of his arrest that he was thirty-two years of age. This statement is challenged by the defendant as hearsay because he could not know his own age had he not been informed of it by a parent or someone who had been present at the time of his birth. His application for a marriage license (Exhibit M), which was dated February 19, 1960, was signed by him as a sworn statement; it gave his age as twenty-nine and the date of his birth as June 14, 1930.

The defendant sat in the court room day after day during the trial, walked about, and was under the constant observation of the jurors who heard this evidence

in his presence and could reach their own conclusions. They were fully justified in finding from their verdict on Count Three that the People had satisfactorily established all the necessary elements involved in this count, including the age of the defendant. Moreover, they had been instructed by the court to do so.

■■■ Defendant further argues:

"It was error for the trial court to strike the testimony of Officer Benfante and permit him to retestify on direct examination."

This officer had picked up the victim after the alleged attack. On direct examination the district attorney failed to have him identify the girl. The court struck this testimony and permitted the witness to retestify on direct examination. Defendant admits that this was a matter within the sound discretion of the court and we find no abuse in the exercise of discretion on this issue.

■■■ Defendant further argues:

"The trial court made unnecessary and improper comments during the course of the trial which constituted reversible error."

Defendant presents this argument under three headings. He first asserts that the trial court erred in admonishing witness Dr. Cornfeld of his duties as a physician and as a citizen to testify when called upon by the district attorney. There was no indication that his testimony, as given, adversely affected the defendant.

Defendant then asserts that it was error to comment on the qualifications of Officer Jensen as an expert witness. The trial judge stated that he knew of Jensen's qualifications as an expert in the field of fingerprint classification and comparison. The defendant later admitted Jensen's qualifications in this field, so the court's remarks in this regard became harmless.

Defendant then asserts that it was error for the trial judge to cite legal authorities in open court in overruling defendant's objections. At one point the trial judge stated to counsel: "I refer you to the Abeyta case." This

was a meaningless statement so far as the jury was concerned. It certainly was not prejudicial.

Defendant further argues that the trial court should have granted defendant's motion for judgment of acquittal made at both the close of the People's case and at the close of defendant's case, and that the court erred in the giving and refusal to give certain instructions to the jury. His main contention in his motions for acquittal was that the People had failed to prove the charge of assault with a deadly weapon. Contrary to this claim, there is competent evidence to establish the fact that defendant did possess a deadly weapon, to-wit, a gun, at the time of the alleged attack, and that it was through fear that he might use the gun that the victim was persuaded to enter the car. According to all of the testimony and the circumstances surrounding the affair she was detained forcibly and against her will.

The victim's father testified that she was unmarried, another essential element of the crime of rape, and there was sufficient evidence that defendant was more than eighteen years of age at the time of the alleged attack. Defendant's identity as being the guilty party was sufficiently established to justify a jury in finding him guilty beyond a reasonable doubt. We are satisfied that all elements of the crimes charged were established by competent evidence, and no error appears so far as the instructions were concerned, the over-all instructions covering all questions raised.

The defendant argues further that the sentences imposed for the convictions of rape and kidnapping constitute cruel and unusual punishment and are therefore invalid for statutory and constitutional reasons. The statutes fixing these penalties are under attack for the first time in Colorado. C.R.S. '53, 40-2-44 and 40-2-45, define the offense of kidnapping and provide punishment not to exceed thirty years. C.R.S. '53, 40-2-25, 40-2-26 and 40-2-27, define the offense of rape, and C.R.S. '53, 40-2-28, defines the punishment, at the discretion of the court, by

imprisonment in the State Penitentiary for life. The sole reason advanced is that the length of the terms of punishment required by the statutes is not commensurate with the offenses which they seek to punish.

▮▮▮▮▮ The sentences imposed in this case were within the limits of the applicable statutes, and under the circumstances here disclosed we are not disposed to alter them. If any reduction of sentence is warranted, such is obtained by executive clemency. *Chasse v. People*, 119 Colo. 160, 201 P.2d 378.

In the recent case of *Specht v. Tinsley*, 153, Colo. 235, 385 P.2d 423, this court held that a statute (C.R.S. '53, 39-19-1, et seq.) authorizing the sentence of certain sex offenders for not less than one day nor more than life, was not in violation of the constitutional prohibition against cruel and unusual punishment.

We are called upon but seldom to review a more revolting case than the circumstances disclosed in this record, involving an assault with a deadly weapon upon, and the kidnapping and rape of, a little eleven-year-old girl by an adult male. It is for such crimes that our legislature has provided for penalties greater than those imposed for lesser crimes, and it was fully justified in doing so for the protection of these children and of society in general. It is apparent that the legislature held a contrary view than that asserted by the defendant, to the effect that the offense involved in this case cannot be described as "excessive aggravation or extreme brutality."

We find no reversible error in the record, and the judgment of the trial court is affirmed.