547 P.2d 273 (1975)
The PEOPLE of the State of Colorado, Plaintiff-Appellee,
v.
Mary Ann NORWOOD, Defendant-Appellant.
No. 75-060.
Colorado Court of Appeals, Div. I.
November 28, 1975.
Rehearing Denied December 26, 1975.
Certiorari Denied March 8, 1976.
*275 John D. MacFarlane, Atty. Gen., Jean E. Dubofsky, Deputy Atty. Gen., Edward G. Donovan, Sol. Gen., E. Ronald Beeks, Asst. Atty. Gen., Denver, for plaintiff-appellee.
*276 Hoyman, Nanney & Dixon, Raymond L. Robert, John Hoyman, Thomas F. Dixon, Denver, for defendant-appellant.
Selected for Official Publication.
BERMAN, Judge.
Defendant, Mary Ann Norwood, appeals from her conviction of first degree murder under § 18-3-102(1)(a), C.R.S.1973. We affirm.
Defendant was charged with the murder of Frank Norwood, her husband of approximately six weeks. At about 9:30 p. m. on the night of the shooting, defendant and her husband were in a bar near the cafe they operated. While they were there, a prosecution witness, Maryellen Thomas, testified she overheard defendant say to her husband, "I'm going to shoot you," during the course of what sounded to the witness like a quarrel. Later, sometime between 10:00 and 10:30 p. m., the witness was in an alleyway outside the bar and saw Mr. Norwood come out of the bar and enter the cafe. As he entered, she heard a voice that sounded like the defendant's shout, "I'm going to shoot you." The witness testified that she then walked past the cafe on her way back to the bar and saw the defendant and her husband in the cafe.
Prosecution witness Manhalter testified that he left the bar around 11:05 p. m. and on his way past the cafe, through a twoinch crack in the shades in the front window, he saw defendant and her husband "sitting by the counter" and, although he could not hear what was being said, it "looked like they was arguing with each other and they was hitting, pushing each other." On his return to the bar about 15 minutes later, he saw a similar scene through the same slit in the shades.
Sometime between 11:20 and 11:40 p. m. Frank Norwood was shot. Thereupon, defendant went to the bar to request assistance, and several persons responded by going to the cafe. Shortly thereafter, the police arrived upon being informed by a young woman, who flagged down a patrol car, that "a man had been shot at the Norwood cafe." Upon their arrival, the police officers found defendant "hysterical," and, in an attempt to calm her, allowed her to examine her husband to see whether he was alive. Defendant knelt down next to her husband, started screaming, "Frank, Frank," and started shaking him. At this point, one of the officers attempted to pull her back from her husband. Defendant then started "pushing" her husband in the stomach in the area of the wound and another officer grabbed defendant to help pull her back. Her purse fell open and the officer observed a gun inside the purse. A hair ribbon was later found under the victim's body.
The victim had been shot in the abdomen and the bullet had exited from his back. Thereafter, in the hospital a bullet was found in the victim's bed clothes and laboratory analysis established that this bullet had been fired from the gun found in defendant's purse, which was registered to her.
Before his death approximately 36 hours after the shooting, Frank Norwood was interviewed twice by law enforcement officers. On both occasions, Mr. Norwood denied he shot himself, and denied defendant shot him, but admitted that he and defendant were "the only two in the cafe." At one point, however, the victim was overheard saying that there were two men in the cafe who shot him. On both occasions, the victim was described as being belligerent toward the police.
The defense presented several witnesses who contradicted some of the prosecution witnesses, particularly the testimony of Maryellen Thomas, on several details of their testimony. Another defense witness testified that the defendant was not wearing the hair ribbon found in the cafe under Frank Norwood's body.
The defendant took the stand and denied shooting her husband. She testified that about 11:00 p. m. she went to the cafe with her husband where they "just talked and kidded around." She stated that she went to the bathroom in the back of the cafe *277 where she remained for approximately 15 minutes. While in the bathroom, she heard no shots, only a "thud" or "thump" that she presumed came from the hotel above the cafe. Upon returning, she found her husband on the floor. As she knelt down next to him, her knee hit a gun. Getting no response from her husband, she ran to the bar for help.
She further testified that her husband had carried the gun all evening in his belt and she did not know how it got into her purse. Also, she claimed that certain objects found on the counter of the cafe, to wit, a package of cigarettes, a bottle of beer, a cigarette butt, matches, and some crumpled napkins, had not been there when she went to the bathroom, and that neither she nor her deceased husband smoked the brand of cigarettes found on the counter.
No testimony was offered or adduced on direct or cross-examination of defendant with regard to the threats prosecution witness Maryellen Thomas had overheard, but defendant did deny that she had had any argument with her husband that evening.
A rebuttal witness for the prosecution, the barmaid, testified that earlier in the evening while defendant was at the bar she had heard defendant say that she and her husband had disagreed about something to do with the cafe and that she would "see him dead before morning." This witness also testified, however, that defendant was drinking heavily and that statements of that sort were not unusual in the bar. Another prosecution witness on rebuttal testified that while in the bar earlier in the evening he had observed a gun in defendant's purse. Defendant did not offer any testimony in surrebuttal.

I.
Defendant first urges that the trial court erred in denying her motion for a change of venue. At the hearing on the motion, defendant produced evidence of the media coverage of the incident as well as the results of a random public opinion survey of a small percentage of the city's residents. Only a few people questioned named the murder as the most discussed local news story in the county in the last six months. The survey also revealed that a large majority of those interviewed had heard of the incident, and that 41 out of 71 people felt the defendant could receive a fair trial in the county.
Defendant is not contending that the publicity surrounding the incident was so massive and prejudicial that a denial of the right to a fair trial may be presumed. See Walker v. People, 169 Colo. 467, 458 P.2d 238. Rather, defendant contends that the pretrial publicity and public opinion survey prove community prejudice. We disagree.
A determination of the existence of prejudice is within the sound discretion of the court. Section 16-6-102, C.R.S.1973; People v. Simmons, 183 Colo. 253, 516 P.2d 117; Nowels v. People, 166 Colo. 140, 442 P.2d 410. "In the absence of massive publicity that can be said to have contaminated the community, the defendant must establish a nexus between the publicity and the alleged denial of a fair trial." Sergent v. People, 177 Colo. 354, 497 P.2d 983. If local prejudice exists, it should show up in the voir dire examination. Nowels, supra.
The oath was administered to 47 persons from a panel of 138. Fifteen persons were excused for cause, one person on the court's motion, five persons were excused on peremptory challenges by the prosecution, and 13 were excused on peremptory challenges by the defendant.
The voir dire disclosed that of the 13 jurors chosen, ten jurors admitted having previously heard about the case but stated they had not formed an opinion, and two jurors indicated they had not heard about the case. Although one juror admitted having previously formed an opinion, he indicated that he could put that opinion aside and view the evidence with an open mind. Furthermore, we note that the defendant did not exercise all of her peremptory challenges before accepting the jury. See Simmons, supra.

*278 "Here the voir dire amply demonstrates the absence of prejudice and the ability of the jurors to set aside any opinions that they may have received from the news media to the end that the case could be determined on the law and on the evidence."
Sergent, supra; Kurtz v. People, 177 Colo. 306, 494 P.2d 97. Accordingly, the trial court did not err in denying defendant's motion for a change of venue.

II.
Defendant next contends that she was denied due process of law through the "negligent handling of evidence and the otherwise inadequate investigation of the homicide, and the circumstances surrounding it and the subsequent loss of opportunities to obtain possibly exculpatory evidence." She argues that these errors "achieve Constitutional significance under Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215; and Cheatwood v. People, 164 Colo. 334, 435 P.2d 402." We disagree.
The investigative negligence she details include, inter alia, failure to find and interview several potential witnesses and failure to fingerprint and preserve several items found at or near the scene of the shooting.
We agree with the trial court's finding on the issue of investigatory errors that:
"It may well be that the Police Department could have done a better job, and whether that would have been an aid or a hindrance to the Defendant, we don't know . . . . There isn't any evidence that they purposely or with intent made evidence unavailable. . . ."
Although the negligent suppression of evidence can violate due process, Trimble v. State, 75 N.Mex. 183, 402 P.2d 162; Seattle v. Fettig, 10 Wash.App. 773, 519 P.2d 1002; Hanson v. Cupp, 5 Or.App. 312, 484 P.2d 847, the evidentiary deficiencies presented here were the result, if anything, of the failure to investigate properly and were not the result of suppression of evidence, negligently or otherwise. No evidence was in fact "suppressed" in the sense that evidence "known to the police or District Attorney and not to the defendant" was not disclosed to the defendant. Trimble v. State, supra.
The only investigatory deficiency that could be construed as "suppression" of evidence would be the alleged obliteration of fingerprints on the murder weapon. However, although the record indicates that a law enforcement official did pick up the gun, there is no evidence in the record as to exactly how he handled the weapon. Had the ballistics expert found the law enforcement official's prints on the weapon, defendant's contention would have more weight. "We cannot, however, decide an issue on a surmise or belief and so hold that . . . the alleged suppression of evidence [here, the destruction of fingerprints on the gun] has not been prove[n]." Cheatwood v. People, supra.
Furthermore this is not a case where the State was aided in a direct manner by the evidence which defendant contends is no longer available. The State could not, and did not, contend that defendant's fingerprints were found on the murder weapon or the beer bottle, that a paraffin test came out positive, that the victim's allegation that two men were the killers had been investigated and was found to be unsupported, nor that the young woman who flagged down the officers was questioned and provided no information relevant to the investigation.
These investigatory gaps were brought out on cross-examination. Defendant was not precluded, on cross-examination or closing argument, from presenting her theory of the case that a more thorough investigation might have established reasonable doubt as to her guilt or even her innocence. See Hale v. State, Ind., 230 N.E.2d 432. The jury with full knowledge of all these facts chose to think otherwise.
We agree that the duty of disclosure includes a duty to preserve, and that a failure *279 to use earnest efforts to preserve evidence for possible use by defendant may result in the imposition of sanctions against the state. U. S. v. Bryant, 142 U. S.App.D.C. 132, 439 F.2d 642; State v. Jones, Or.App., 525 P.2d 194. However, we also agree that:
"DISMISSAL . . . frustrates the public right. It is a drastic remedy to be reserved for severe situations. Unless the circumstances of the unavailability of evidence reach the dimensions of constitutional due process, then trials should proceed in reliance upon that evidence which exists, rather than be barred because some evidence is not available." State v. Jones, supra.

See also Fresquez v. People, 178 Colo. 220, 497 P.2d 1246. The actions of the law enforcement officials in this case are not to be condoned, but since we find that these investigatory defects are not of constitutional dimensions, we reject this allegation of error.

III.
Defendant next contends that the trial court erred in three of its rulings with regard to the State's witness Maryellen Thomas: (1) In determining that she was competent to testify and refusing to strike her testimony on the ground that it was impeached as a matter of law; (2) in refusing to allow defendant to impeach her testimony by reference to the witness' prior commitment to the Colorado State Hospital; and (3) in refusing to grant defense counsel access to the records of the witness' prior hospitalization under a hold and treat order (see § 27-9-105, C.R.S. 1973) for the purpose of impeachment.
The witness' testimony was contradicted by several defense witnesses. Maryellen Thomas testified that the reason she was outside of the bar at the time she heard defendant threaten her husband was because Wanda North was to pick her up and take her home. Defense witness North testified, however, that she had not made any arrangements to pick up Thomas in front of the bar on the evening of the shooting, that she was in Denver, and that Thomas knew this. Defense witness Barnes testified that he was with Thomas at the bar and had not seen her ever leave the bar prior to closing time (midnight).
Defense counsel cross-examined Thomas extensively. Bias against the defendant was conceded by the witness. Defense counsel also attempted to impeach the witness, pursuant to § 16-10-201, C.R.S.1973, with two prior inconsistent statements she had given to an investigator for the defendant. One of the statements, however, was never offered into evidence. The witness disavowed making the relevant portions of the other statement and, because defense counsel did not lay a proper foundation, it too was not admitted into evidence.
The question of a witness' competence is within the trial court's discretion. Johnson v. People, 171 Colo. 505, 468 P.2d 745. Inconsistencies and contradictions affect the credibility of a witness, and must be resolved by the jury, as was done here. Raullerson v. People, 157 Colo. 462, 404 P.2d 149.
All persons are presumed competent to testify unless they are excluded because they are "of unsound mind at the time of their production for examination." Section 13-90-106, C.R.S.1973; Williams v. People, 157 Colo. 443, 403 P.2d 436. Thus, we find no abuse of discretion by the trial court in its ruling on the issue of competency. Nor do we find this witness' testimony "so palpably incredible and so totally unbelievable as to be absolutely impeached as a matter of law." People v. Martinez, Colo., 531 P.2d 964.
Furthermore, the trial court did not err in refusing to allow impeachment of the witness by reference to the witness' prior commitment to the Colorado State Hospital. The mere fact of hospitalization for a period of six weeks, three and onehalf years before the trial, is too remote to affect, per se, a witness' credibility. Cody *280 v. State, 361 P.2d 307 (Okl.Cr.App.). "Unless the relevancy of impeaching evidence is plain, it should not be admitted." Johnson v. People, supra.
Defendant also contends the trial court erred in its denial of her requests for access to the records of the witness' prior hospitalization. These records were sealed pursuant to § 27-9-105(12), C.R.S.1973, which provides that they shall remain sealed "until and unless the court orders them opened for good cause shown."
The trial court, in chambers, summarized the contents of the hospital records for defendant's counsel.[1] We have examined these records and reviewed defense counsel's cross-examination of Mrs. Thomas, and we conclude that the information contained in these records which might have relevance for impeachment purposes was elicited from the witness on cross-examination.
Defense counsel was permitted to crossexamine the witness about her condition, medical care, and treatment at the time of the alleged incident and at the time of the trial. In this regard, she testified that she was currently under a doctor's care and was taking medication for "epilepsy," a condition she said she had had since the eighth grade. She admitted that she had "spells" in connection with her condition, and stated that she saw her doctor at least once a month for her "epilepsy." Since all relevant information contained in the records was presented to the jury, defendant was not prejudiced by the court's refusal to permit actual inspection.

IV.
For defendant's fourth allegation of error, she urges that the court erred in its instruction to the jury on intoxication which stated:
"Voluntary intoxication of an accused is not a defense to a criminal charge, but evidence of intoxication of a defendant may be offered whenever it is relevant to negative the existence of a specific intent."
Defendant contends that the instruction is prejudicially defective because it is couched in the terms "evidence may be offered" and because it did not inform the jurors that intoxication relates to premeditation. The language of the instruction is a partial quotation from § 18-1-804(1), C. R.S.1973, and instructions framed in the language of the statutes have been held sufficient. People v. Bowen, 182 Colo. 294, 512 P.2d 1157.
The jury was instructed, inter alia, that whether evidence is admissible is a question of law to be determined by the court, that the crimes charged required a specific intent, including a definition of specific intent (verbatim from Colorado Jury Instructions (Criminal) 6:2), and that intoxication may negative specific intent. The jury was instructed further that first degree murder requires proof of four elements (verbatim from Colorado Jury Instructions (Criminal) 9:1), and that premeditation means a design formed to do something at any time before it is done.
Although the intoxication instruction did not specifically mention premeditation, the instructions, when read together and taken as a whole, adequately informed the jury of the law. People v. Manier, Colo., 518 P.2d 811. Accordingly, we find this allegation of error to be without merit.

V.
Defendant next urges that there is insufficient evidence to support the verdict on the issues of identification and premeditation.
Defendant's contention that a conviction based wholly on circumstantial evidence must exclude every reasonable hypothesis *281 other than that of guilt is no longer the law in Colorado. In People v. Bennett, 183 Colo. 125, 515 P.2d 466, the Colorado Supreme Court adopted the "substantial evidence test" which "affords the same status to both direct and circumstantial evidence." Accordingly, the issue on review is whether the relevant evidence, both direct and circumstantial, when viewed in the light most favorable to the prosecution, is "substantial and sufficient" to support the verdict.
Although it is circumstantial in nature, there is sufficient substantial evidence in the record identifying defendant as the person who shot the deceased to support the verdict.
Defendant contends that the evidence on intent was insufficient to support a verdict of first degree murder, which crime requires the premeditated intent to cause the death of another. Section 18-3-102(1)(a), C.R.S.1973. However, the prosecution evidence as detailed above includes testimony of threats by defendant against her husband shortly before the shooting which coupled with the testimony as to a quarrel between them, is sufficient to sustain a finding of premeditation. And, since the jury was instructed on both first and second degree murder, we find no error in its resolution of this issue.

VI.
Finally, defendant contends she was not permitted to see her husband prior to his death and this denied her the right to confront the witnesses against her. The victim was in critical condition, underwent surgery twice, and was in intensive care until his death 36 hours after the shooting. The only reference in the record to a request by defendant to see her husband occurred on the night of the shooting at a time when the victim was in surgery. Under these circumstances, and in light of the fact that all of the victim's statements to the police, discussed supra, including those exculpatory of the defendant, were presented to the jury, we find no merit to defendant's argument.
Judgment affirmed.
COYTE and ENOCH, JJ., concur.
NOTES
[1] We note that the records may be subject to a claim of privilege, § 13-90-107, C.R.S.1973; Young v. McLaughlin, 126 Colo. 188, 247 P. 2d 813, and that the witness, according to the prosecuting attorney, refused defense counsel's request for permission to inspect her hospital records.